## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK FAM,

              Plaintiff,

        v.

BANK OF AMERICA NA (USA) *et al.*,

              Defendants.

Civil Action No. 15-1943 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff Mark Fam, who is proceeding *pro se,* brings this action against his loan servicers Bank of America, N.A. ("BANA") and Green Tree Servicing LLC, now known as Ditech Financial LLC ("Ditech").  First Am. Compl. ("FAC") at 1, ECF No. 18.  The plaintiff asserts claims for violations of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1634 *et seq*., and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, as well as for breach of contract, common law fraud, and breach of the implied covenant of good faith and fair dealing.  These violations all stem from the plaintiff's March 2012 mortgage refinancing.  *Id.* ¶¶ 143-73.  Pending before the Court are Ditech and BANA's respective Motions to Dismiss, *see* Mot. Dismiss by Ditech Financial LLC, Green Tree Servicing LLC ("Ditech MTD"), ECF No. 19; Mot. Dismiss by Bank of America NA (USA) ("BANA MTD"), ECF No. 25, and the plaintiff's motion for default judgment as to BANA, *see* Pl.'s Mot. Default Judgment as to Bank of America ("Pl.'s Mot. Default Judgment"), ECF No. 26.  Defendants move to dismiss the complaint primarily for improper venue as well as for failure to state a claim upon which relief may be granted, pursuant to Rules 12(b)(3) and 12(b)(6) respectively, of the Federal Rules of

Civil Procedure.  For the reasons set forth below, the plaintiff's case is transferred to the Eastern District of Virginia.

## I.    BACKGROUND

The plaintiff, a resident of the Commonwealth of Virginia, refinanced his home with BANA in March 2012, sought a forbearance in April 2013, and was purportedly granted a six-month forbearance in May 2013, with the possibility of an additional six-month extension.  *See* FAC ¶¶ 1, 4, 18, 24–29, 53.  The plaintiff claims that in October 2013, he requested the second six-month forbearance period.  *Id.* ¶ 57.  Nonetheless, in November 2013, servicing of the loan was transferred to Ditech, which did not honor or consider the additional six-month forbearance. *See id.* ¶¶ 69–70, 100.  Instead, Ditech immediately attempted to collect arrearages on the loan and, beginning in 2014, sought to foreclose the plaintiff's home of thirty years.  *Id.* ¶¶ 102–06. The plaintiff also alleges that in August 2014, he "[e]ffected a [r]escission of the March 18, 2012 mortgage loan by sending a Notice of Rescission" to both BANA and Ditech.  *Id.* ¶ 5; *see also id.* ¶¶ 15, 106, 109, 113.  The details relevant to the pending motions are discussed below.

### A. The Mortgage Refinance

The plaintiff resides in Alexandria, Virginia and, on March 18, 2012, closed a home refinance loan for his property with BANA.  *Id.* ¶ 1.  The settlement took place in Virginia at a BANA branch with which the plaintiff was not familiar, though he notes that the loan closer "was sent from an office in Washington, D.C." and had "first suggested meeting at an office in Washington D.C."  *Id.*  The loan closer encouraged the plaintiff, who was not represented by counsel, to sign the documents quickly.  *Id.*  Although the plaintiff was shown disclosure notices, he was not given any notices to keep, as the loan closer left the room "to make copies" and never returned.  *Id.* ¶¶ 1-2.  Eventually, bank employees asked the plaintiff to leave the branch, and told the plaintiff to contact the loan closer in order to obtain copies of the documents he signed,

suggesting the plaintiff would receive the copies in the mail.  *Id.* ¶¶ 2-3.  The following day, the

plaintiff contacted the branch manager for the location where he signed the new mortgage loan in

hopes of contacting the loan closer.  *Id.*  The manager told the plaintiff, "I've not seen him

before," and the plaintiff was at a loss for how to find the person who had taken the only copy of

his signed mortgage loan documents.  *Id.* ¶ 3.  The plaintiff was never given any copies of the

forms that he saw during the loan closing.  *Id.* ¶ 4.

### B. The Forbearance Agreement Promised by BANA, Followed by the Alexandria City Police SWAT Team

In April 2013, just over a year after refinancing his mortgage, the plaintiff placed a series

of calls to BANA to "inquire about possible mortgage relief assistance options."  *Id.* ¶ 17.

During the first three calls, the plaintiff was given a variety of reasons why he was not eligible

for assistance, including the date of origination for the loan, that he was not behind on his

mortgage payment, and that his health concerns were not "cancer."  *Id.* ¶¶ 17-19.  The plaintiff

"made a series of verbal and written complaints to the senior executives and to the Board of

Director[s]."  *Id.* ¶ 22.  At all times, the plaintiff was current on his mortgage, though he did

leave his job during this time period due to medical issues.  *Id.* ¶¶ 20, 22.

The plaintiff subsequently discovered that the Federal National Mortgage Association,

commonly known as "Fannie Mae," "had some stake in the home loan" and began lobbying

Fannie Mae "by telephone, emails, and by U.S. mail and by in-person visits to [Fannie Mae]

headquarters in" the District of Columbia.  *Id.* ¶ 23.  On May 7, 2013, a Fannie Mae senior

manager informed the plaintiff that several relief assistance programs were available to him and

that her office had instructed BANA to contact the plaintiff about those options.  *Id.*  ¶¶ 23-24.

Later that same day, Daniel Whitehead, "a Vice President-Unit Manager in . . . [BANA's]

Default Servicing Complaint Resolution Department" contacted the plaintiff and offered: "A)

one-year forbearance, with no payments; divided into two 'six-month segments[,]', and, B) no escrow, no tax capture or insurance payment, and C) no adverse notations in [BANA] records, and D) no negative credit reporting to any consumer reporting agency, and, E) no late fees would be charged to the [plaintiff's] account for the duration of the Special Forbearance." *Id.* ¶ 24. Whitehead added "that the arrearage created by the one-year forbearance would be 'put on the back end of the loan.'" *Id.* The plaintiff requested a chance to "think about the offer overnight and said he would call Whitehead the next day." *Id.*

The next day, May 8, 2013, Whitehead told the plaintiff that he "had full authority to produce and secure the forbearance agreement and that . . . all the [plaintiff] had to do was notify [Whitehead] that [the plaintiff] needed the second half of the forbearance." *Id.* ¶ 27. The plaintiff agreed to all of the terms except that he requested to pay some amount each month of the forbearance. *Id.* ¶ 29. The parties agreed that the plaintiff would pay $425 on the 15th of each month during the forbearance. *Id.*

When the plaintiff received the Special Forbearance Agreement ("SFA") via email on May 17, 2013 and FedEx on May 18, 2013, however, the documents were dated May 10, 2013, "two days after the [plaintiff] and Whitehead entered into a verbal agreement on the terms and conditions of the SFA," and required that the first payment under the agreement be paid by May 15, 2013. *Id.* ¶¶ 30-31. The plaintiff "rushed to a BANA branch and forced them to accept" payment, but the account was marked late and late fees were charged. *Id.* ¶ 32 (footnote omitted). On May 25, 2013, the plaintiff received another letter from BANA, requiring payment by May 15, 2013, and indicating that the SFA may be cancelled in the event of late payment. *Id.* ¶ 33. The June 2013 statement included a late fee for the May payment. *Id.* ¶¶ 34, 38. After receiving the June statement, the plaintiff attempted to contact Whitehead multiple times

regarding the late fees.  *Id.* ¶ 38.  The plaintiff states that each payment was made on time at a

BANA branch, but negative reports were given to the three credit bureaus.  *Id.* ¶¶ 34–35.

On June 19, 2013, the plaintiff received an email from Whitehead, which stated that

following successful completion of the SFA, "the late charges will be waived from the account

prior to the reinstatement of the loan through either the creation of a repayment plan,

modification, or full reinstatement."  *Id.* (italics omitted).

Notwithstanding Whitehead's assurances, shortly after receiving the June statement, the

plaintiff received a letter that the "entire SFA was in complete default."  *Id.* ¶ 41.  The next day,

the plaintiff received a Notice of Intent to Accelerate, which was dated June 26, 2013.  *Id.* ¶ 42.

That notice required two full monthly payments plus late fees by August 5, 2013, in order to cure

the debt, "otherwise BANA would commence foreclosure proceedings."  *Id.* ¶ 42.  After

speaking with Whitehead about the Notice of Intent to Accelerate, Whitehead sent the plaintiff

an email stating, "I have reinstated the Special Forbearance and will continue to monitor the

account weekly going forward."  *Id.* ¶ 44.

On July 3, 2013, in a conversation with Whitehead, the plaintiff stated: "You are driving

me insane, I can hardly breathe any longer, I kept my end of the bargain."  *Id.* ¶ 47.  Shortly

thereafter, the Alexandria City Police SWAT team arrived at the plaintiff's house, consisting of

"a half a dozen officers, multiple vehicles, in front of the [plaintiff's] home."  *Id.* ¶¶ 48-49.

When the plaintiff inquired as to why the police had arrived, the police informed him that,

"[y]our bank called us from California."  *Id.* ¶ 48.  The plaintiff states that "it was later

determined after examination of records that Whitehead had reported the Plaintiff as some 'sort

of danger.'"  *Id.*  Following this, the plaintiff went to the Alexandria Police headquarters and

"discovered that there was now a permanent 'Police Record' associated with his property and

that information would appear on any police system that searched the [plaintiff's] address," which the plaintiff believes could impact his future employment opportunities. *Id.* ¶ 51.

On October 15, 2013, Whitehead called the plaintiff to remind him that the first segment of the SFA was almost up and ask if he needed the second segment. *Id.* ¶ 56. The plaintiff requested the second six-month forbearance. *Id.* ¶ 57. Whitehead told the plaintiff that an associate would prepare the documents and that the plaintiff should receive them by October 18, 2013. *Id.* ¶¶ 57–58. This was the last time the plaintiff interacted with Whitehead, and the plaintiff never received the promised documents. *Id.* ¶ 59.

On October 23, 2013, the plaintiff reached out to Fannie Mae. *Id.* ¶¶ 60, 64. The supervisor he spoke with "informed [the plaintiff] that there was . . . no notation in the system that showed anyone at [BANA] had submitted a SFA extension request," which is required for any forbearance over six months. *Id.* ¶ 64. The supervisor noted her concern that nothing had been submitted, as "it was highly unlikely that [Fannie Mae] would receive [BANA's] extension request, review it, and approve it within the eight (8) days remaining in the month." *Id.* ¶ 65.

### C. Transfer to Ditech and Subsequent Events

On October 21, 2013, the plaintiff received a letter, dated October 16, 2013, that his loan was past due and would be "forwarded for foreclosure proceeding if the [plaintiff] did not immediately cure the outstanding debt." *Id.* ¶ 69. The next day, October 22, 2013, the plaintiff received a notice that the servicing of his loan had been transferred to Ditech. *Id.* ¶ 70. This notice was dated five days before the conversation with Whitehead about the second part of the forbearance agreement. *Id.*

On October 28, 2013, Sasha Rainey, a Vice President and colleague of Whitehead's at BANA, called the plaintiff and informed him that she was taking over for Whitehead. *Id.* ¶ 73. Rainey stated she was "approving and confirming activation of the second part of the

6

forbearance," and had started the approval process with Fannie Mae. *Id.* ¶ 74. She also noted that she had waived the late fees, was looking into the credit reporting issues, and was attempting to set up the forbearance before the transfer to Ditech. *Id.* ¶¶ 73–76. Rainey stated that she "personally submitted the SFA extension request directly to [Fannie Mae] and asked that its review be expedited." *Id.* ¶ 79. The plaintiff states he "knew there was virtually no chance that [Fannie Mae] would be processing Rainey's submission" before the expiration of the first segment of the SFA. *Id.* ¶ 80. This was the only interaction that the plaintiff had with Rainey and "[e-]mails and voice mail messages went unanswered." *Id.* ¶ 82. At some point, a Fannie Mae supervisor informed the plaintiff that the request for a second six-month forbearance had indeed been submitted, but was denied because it was incomplete. *Id.* ¶ 84.

On October 31, 2013, Vanessa Lee called the plaintiff and identified herself as his new contact with BANA, informed him that Rainey was "no longer involved with the [plaintiff's account], took note of his concerns, and said she would "turn her notes over to a review panel," which would have 30 days to provide a resolution. *Id.* ¶¶ 88-89. The plaintiff asked how the transfer to Ditech would be impacted. *Id.* ¶ 91. Lee responded that she was unaware of a transfer and requested that plaintiff read the transfer notice. *Id.* Afterward, Lee said "This information is only good until 5:00 pm today, sir," adding that "You're going to hear from a new representative within 24 hours from [Ditech]," *id.* ¶ 92.

Ditech immediately began collection on the mortgage and "denied existence . . . of *ANY* forbearance previously established by BANA." *Id.* ¶ 98 (emphasis in original). The plaintiff's first contact with Ditech, on November 18, 2013, did nothing to convince Ditech that a forbearance had been in place. *Id.* ¶ 99. Ditech refused to accept any payment "unless the past due accrual of six full months (the first segment of the SFA period) was paid first" and "ordered

7

a Trustee to hold a non-judicial foreclosure sale," which was scheduled for August 19, 2014 but was later cancelled.  *Id.* ¶¶ 102–04, 106.

On August 4, 2014, the plaintiff claims to have "[e]ffected a [r]escission of the March 18, 2012 mortgage loan by sending a Notice of Rescission" by certified mail to four BANA addresses, Ditech's legal counsel, Fannie Mae, the named Trustee on the Deed of Trust, and the Consumer Financial Protection Bureau.  *Id.* ¶ 5.  The copy of the rescission was recorded by the Clerk of the City of Alexandria.  *Id.*

On August 19, 2014, the date of the first foreclosure sale, the plaintiff spoke with two of Ditech's employees to inform them that he had rescinded the loan.  *Id.* ¶¶ 116–18.  A supervisor told the plaintiff that, "[Ditech] doesn't own the loan."  *Id.* ¶ 118.  Nonetheless, the plaintiff alleges that, on November 15, 2014, Ditech "notified the [p]laintiff it had acquired BANA's interest in his home mortgage loan."  *Id.* ¶ 167.  One year later, in September 2015, Ditech again notified the plaintiff that foreclosure proceedings would commence if the plaintiff did not cure the loan in full.  *Id.* ¶ 129.

### D. Procedural History

The plaintiff filed his original complaint on October 31, 2015.  *See* Compl., ECF No. 1. Initially, the defendants included Ditech, Fannie Mae, BANA, Daniel Whitehead, and Rosenberg & Associates, LLC ("Rosenberg"), counsel for Ditech for the purposes of foreclosing on the plaintiff's property.  *See* Compl. at 2-4; *see also* Mem. Supp. Mot. Dismiss by Rosenberg & Associates, LLC ("Rosenberg Mem.") at 1, ECF No. 4-1.

On December 1, 2015, the plaintiff filed an emergency motion for a temporary restraining order or preliminary injunction to prevent a foreclosure sale of his home scheduled for December 2, 2015.  Pl.'s Mot. Temporary Restraining Order, ECF No. 7.  When the Court

8

held a hearing by teleconference, Ditech informed the Court that the sale had been cancelled and the Court subsequently denied the plaintiff's motion as moot.  Minute Order, December 2, 2015.

On February 23, 2016, the plaintiff filed a motion for leave to file an amended complaint. *See* Pl.'s Mot. for Leave to File First Amended Complaint, ECF No. 15.  Ditech opposed the motion on the grounds that venue was improper and thus, any amended complaint would be "futile."  *See* Ditech's Opp'n Pl.'s Mot. for Leave to File First Amended Complaint at 3-4, ECF No. 17.  On March 18, 2016, this Court granted the plaintiff's motion for leave to file an amended complaint, concluding that plaintiff's proposed amendment was not "facially futile, particularly because *pro se* pleadings are held 'to less stringent standards than formal pleadings drafted by lawyers.'"  Minute Order, March 18, 2016 (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  In the FAC, filed on March 18, 2016, the plaintiff removed Rosenberg, Fannie Mae, and Whitehead as named defendants.  FAC at 1.

The following month, on April 4, 2016, Ditech filed its motion to dismiss for improper venue and for failure to state a claim upon which relief may be granted, pursuant to Rules 12(b)(3) and 12(b)(6), respectively, of the Federal Rules of Civil Procedure.  On April 13, 2016, a summons was issued electronically as to BANA and Ditech.  Unnumbered ECF Entry, April 13, 2016.

On June 17, 2016, the plaintiff filed a Return of Service/Affidavit, purporting to show that service had been perfected upon defendants, including upon BANA by serving a branch manager, Amy Dawn Rufino, at a BANA branch located at 1090 Vermont Avenue NW, Washington, D.C. 20005 (the "Vermont Ave. Branch").  Return of Service/Affidavit, ECF No. 24.  According to BANA, Rufino no longer works for the company and BANA has been unable "to inquire with Ms. Rufino regarding the alleged service."  BANA Opp'n Pl.'s Mot. for Default

Judgment ("BANA Opp'n Def. Judg.") at 3 ¶ 4, ECF No. 28.  The plaintiff's service affidavit is

signed by Ryan Davis with a title of "Field Specialist/Litigation."  Return of Service/Affidavit at

3.  As BANA notes, the affidavit does not indicate that Davis works for a particular company

and provides only a Mahopac Falls, NY mailing address with no telephone number or e-mail.

*See* BANA Opp'n Def. Judg. at 3 ¶ 5; Return of Service/Affidavit at 1-3.  BANA also notes the

affidavit does not provide any statement as to how the summons and complaint were served upon

Rufino, nor is it accompanied with an exhibit with Rufino's signature or any other evidence that

she received copies of the summons and complaint.  *See* BANA Opp'n Def. Judg. at 4 ¶ 7.

 Six months after the filing of the FAC, BANA had neither answered the complaint nor

filed any dispositive motion.  This Court issued an Order to Show Cause why the action against

BANA should not be dismissed for failure to prosecute, pursuant to Local Civil Rule 83.23 and

Federal Rule of Civil Procedure 41(b), or alternatively, instructing the plaintiff to seek default

judgment, pursuant to Federal Rule of Civil Procedure 55.  Minute Order, Oct. 6, 2016.  BANA

explains that shortly after October 6, 2016, it first became aware of the FAC when counsel for

Ditech e-mailed a copy of the FAC to BANA and informed BANA of the Court's Minute Order.

BANA Opp'n Def. Judg. at 4 ¶ 9; *see also id.* Aff. of BANA Vice President, Legal Department

Administration, at ¶¶ 5-6, ECF No. 28-2.

 On October 28, 2016, BANA filed its own motion to dismiss, refusing to "concede that

the Plaintiff has perfected service of process . . . ."  BANA MTD, at 1.  With regard to the

plaintiff's TILA, breach of the implied covenant of good faith and fair dealing, and breach of

contract claims, BANA "adopt[ed] and incorporate[d] . . . by reference the arguments offered by

[Ditech]" in its motion to dismiss.  *Id.* at 2.  As for the plaintiff's claim of common law fraud by

BANA, BANA argues the plaintiff fails to allege "with particularity all necessary elements of the cause of action." *Id.*

The plaintiff subsequently filed a motion for default judgment as to BANA. In his motion, the plaintiff references his Return of Service/Affidavit of Summons and Complaint Executed, which was filed with the Court on June 17, 2016. In his affidavit, the plaintiff states that he served a summons on "Amy Dawn Rufino," the Financial Center Operations Manager for BANA on June 2, 2016. Pl.'s Return of Service/Affidavit of Summons and Complaint Executed, ECF No. 24.

## II.     LEGAL STANDARD

Rule 12(b)(3) of the Federal Rules of Civil Procedure authorizes a party to move to dismiss a case for "improper venue." FED. R. CIV. P. 12(b)(3). Similarly, the federal venue statute, 28 U.S.C. § 1406(a), requires that a district court "dismiss, or if it be in the interest of justice, transfer" a case, which is filed "in the wrong division or district." 28 U.S.C. § 1406(a). Together, "Section 1406(a) and Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper'. . . in the forum in which [the case] was brought." *Atl. Marine Constr. Co. v. U.S. Dist. Court,* 134 S. Ct. 568, 577 (2013). "Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, . . . ." *Id.*

The moving party objecting to venue must provide "sufficient specificity to put the plaintiff on notice of the defect" that the case fails to fall within one of the three categories set out in section 1391(b). 14D CHARLES ALAN WRIGHT *et al.*, FEDERAL PRACTICE AND PROCEDURE § 3826, at 496 (4th ed. 2013). Nonetheless, the burden remains on the plaintiff to establish that venue is proper since it is "'the plaintiff's obligation to institute the action in a permissible

forum, . . . .'" *Williams v. GEICO Corp.*, 792 F. Supp. 2d 58, 62 (D.D.C. 2011) (quoting

*Freeman v. Fallin,* 254 F. Supp. 2d 52, 56 (D.D.C. 2003)); *see also Ananiev v. Wells Fargo*

*Bank, N.A.*, 968 F. Supp. 2d 123, 129 (D.D.C. 2013) (citing 14D CHARLES ALAN WRIGHT *et al.*,

FEDERAL PRACTICE AND PROCEDURE § 3826, at 502, 505–06 ("[W]hen [an] objection has been

raised, the burden is on the plaintiff to establish that the district he [or she] chose is a proper

venue [,] . . . consistent with the plaintiff's threshold obligation to show that the case belongs to

the particular district court in which the suit has been instituted.")).[1]

      In assessing a motion for improper venue, the court "'accepts the plaintiff's well-pled

factual allegations regarding venue as true, draws all reasonable inferences from those

allegations in the plaintiff's favor and resolves any factual conflicts in the plaintiff's favor.'"

*McCain v. Bank of Am.*, 13 F. Supp. 3d 45, 51 (D.D.C. 2014), *aff'd sub nom. McCain v. Bank of*

*Am. N.A.*, 602 Fed. App'x 836 (D.C. Cir. 2015) (quoting *Wilson v. Obama,* 770 F. Supp. 2d 188,

190 (D.D.C. 2011) (quoting *James v. Verizon Servs. Corp.,* 639 F. Supp. 2d 9, 11 (D.D.C.

2009))); *see also Darby v. U.S. Dep't of Energy*, 231 F. Supp. 2d 274, 276 (D.D.C. 2002)). "The

Court, however, need not accept the plaintiff's legal conclusions as true, and may consider

material outside the pleadings, including undisputed facts evidenced in the record, to determine

whether it has jurisdiction in the case." *Ananiev v. Wells Fargo Bank, N.A.*, 968 F. Supp. 2d at

129 (quoting *Ebron v. Dep't of Army,* 766 F. Supp. 2d 54, 57 (D.D.C. 2011) (citing *Jerome*

---

[1]      Although the D.C. Circuit has not had occasion to opine on the issue, this Court has consistently held that the burden remains on the plaintiff. *See, e.g., Chandler v. Stover*, No. CV 15-0012 (BAH), 2016 WL 5675687, at *6 (D.D.C. Sept. 30, 2016) (citing *Walden v. Locke*, 629 F. Supp. 2d 11, 13 (D.D.C. 2009))*; Delta Sigma Theta Sorority Inc. v. Bivins,* 20 F. Supp. 3d 207, 211 (D.D.C. 2014) (citing *Williams v. GEICO Corp.,* 792 F. Supp. 2d at 62); *McCain v. Bank of Am.*, 13 F. Supp. 3d 45, 50 (D.D.C. 2014) *aff'd sub nom. McCain v. Bank of Am. N.A.*, 602 F. App'x 836 (D.C. Cir. 2015); *Abraham v. Burwell*, 110 F. Supp. 3d 25, 28 (D.D.C. 2015); *Roland v. Branch Banking & Trust Corp.*, 149 F. Supp. 3d 61, 68 (D.D.C. 2015); *Ananiev v. Wells Fargo Bank, N.A.*, 968 F. Supp. 2d at 129; *Gipson v. Wells Fargo & Co.*, 563 F. Supp. 2d 149, 152 (D.D.C. 2008).

*Stevens Pharm., Inc. v. Food & Drug Admin.,* 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Coal. for Underground Expansion v. Mineta,* 333 F.3d 193, 198 (D.C. Cir. 2003); *Herbert v. Nat'l Acad. of Sci.,* 974 F.2d 192, 197 (D.C. Cir. 1992); *Haley v. Astrue,* 667 F. Supp. 2d 138, 140 (D.D.C. 2009))).

## III.    DISCUSSION

The plaintiff is seeking declaratory, injunctive, and monetary relief to prevent the defendant from collecting on a loan and foreclosing his home and to compensate him for the allegedly unlawful actions to collect on the loan thus far.  FAC at 57–60.  Although Ditech requests dismissal of the plaintiff's complaint, Ditech also recognizes that transfer to the Eastern District of Virginia could be appropriate.  Ditech Mem. Supp. Mot. Dismiss ("Ditech Mem.") at 5, ECF No. [19-1].  Based, at least in part, on the mistaken belief that "[v]enue is appropriate [where] complete diversity exists," the plaintiff has filed his lawsuit in the District of Columbia. FAC at 5.  As explained below, however, this jurisdiction is not the proper venue for this action. The standard for improper venue is applied to the plaintiff's complaint and assessed below.  The question of whether the action should be dismissed, or instead transferred to an appropriate venue, is discussed thereafter.

### A. Venue is Properly in the Eastern District of Virginia

Although the plaintiff argues that the TILA does not have a venue provision, Pl.'s Opp'n Ditech's Mem. at 4–5, ECF No. 22, it is the general federal venue statute that "govern[s] the venue of all civil actions brought in district courts of the United States," unless "otherwise provided by law," 18 U.S.C. § 1391(a).

The federal venue statute provides three bases for venue.  First, venue is proper in a "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Here, the plaintiff states that Ditech and

BANA reside outside of the District of Columbia, as Ditech's corporate headquarters are in Pennsylvania and BANA's corporate headquarters are in North Carolina.  FAC at 4.  Thus, the first basis for venue is inapplicable.

Second, venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  28 U.S.C. § 1391(b)(2).  According to the complaint, although the loan was closed by an officer who "was sent from an office in Washington, D.C." and had "first suggested meeting at an office in Washington, D.C.," FAC ¶ 1, the property in question is located in Virginia, the alleged loan rescission was recorded in Virginia, and cancelled foreclosure sales of the plaintiff's home have been in Virginia.  *Id.* ¶¶ 1, 5, 130.  Hence, the second basis for venue is also inapplicable.  *See Roland v. Branch Banking & Trust Corp.*, 149 F. Supp. 3d 61, 68 (D.D.C. 2015) (finding the second basis for venue inapplicable for a similar action in D.C. where a complaint alleged that the relevant property was located in Maryland and the foreclosure proceeding at issue took place in Maryland).

Finally, if no other district is appropriate, venue is proper in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b)(3).  In this case, venue is proper in another district, rendering this prong of the general venue statute unavailable here.  Specifically, venue for this case would be proper in the Eastern District of Virginia, as the plaintiff is a citizen of Virginia, the property in question is located in that district, the plaintiff recorded the alleged rescission in that district, and any foreclosure would occur in that district.  FAC ¶¶ 1, 5, 130.  Indeed, although Ditech proposes that dismissal, rather than transfer, is warranted, Ditech concedes that the Eastern District of

Virginia would be an appropriate venue for this action.  Ditech Mem. at 5.  Consequently, this action is brought in the wrong district.

The plaintiff opposes transfer to the Eastern District of Virginia, contending that "[t]he property does not have to have any connection to the District of Columbia in order to take advantage of this District Court," particularly if the defendants are not "inconvenienced by the alternate District choice."  Pl.'s Opp'n Ditech's MTD at 5.  Additionally, the plaintiff argues that Fannie Mae—described by the plaintiff as an "erstwhile Defendant" or "fertile witness"—resides in the district, and the district "offers airports and much nicer accommodations than anything Virginia has to offer."  Pl.'s Opp'n Ditech's MTD at 5 (internal quotation marks omitted).

At the outset, as Ditech notes, "[i]t is hard to imagine a more convenient forum for Plaintiff" than the Eastern District of Virginia "since the Property is located in Alexandria, Virginia where . . . the United States District Court for the Eastern District of Virginia is also located."  Ditech Mem. at 8.  In any event, the plaintiff appears to confuse the standard of 28 U.S.C. § 1406(a) with § 1404(a), and makes arguments pertinent only to the latter section.  Section 1404(a) permits district courts "[f]or the convenience of parties and witnesses" and "in the interest of justice" to "transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  Whereas Section 1406(a) is premised on an action being brought in the "wrong" district, "[Section] 1404(a) does not condition transfer on the initial form's being 'wrong,'" rather "it permits transfer to any district where venue is also proper (*i.e.*, 'where [the case] might have been brought.)'"  *Atl. Marine Constr. Co. v. U.S. Dist. Court*, 134 S.Ct. at 579; *see also Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) ("Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized,

case-by-case consideration of convenience and fairness.'" (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964))).  Thus, while "convenience of parties and witnesses" plays a role in a transfer under Section 1404(a), these considerations are irrelevant to this case, where the plaintiff's complaint has, as explained above, simply been filed in the wrong venue.

Finally, the plaintiff seeks to keep his case in this judicial district because this Court has both diversity and subject-matter jurisdiction over his claims, FAC at 5, but the Eastern District of Virginia does too.  In addition to having subject-matter jurisdiction over the plaintiff's federal claims, the allegations in the FAC indicate that the U.S. District Court for the Eastern District of Virginia would also have diversity jurisdiction, under 28 U.S.C. § 1332, since, according to the FAC, the plaintiff is a resident of Virginia, BANA's corporate headquarters is in Charlotte, North Carolina, and Ditech's corporate headquarters is in Fort Worth, Pennsylvania.  FAC at 4. Thus, complete diversity appears to exist between all the parties.  *See CostCommand, LLC v. WH Administrators, Inc.*, 820 F.3d 19, 21 (D.C. Cir. 2016) ("A corporation is a citizen of its place or places of incorporation, as well as its principal place of business." (citing 28 U.S.C. § 1332(c)(1))).

In sum, the District of Columbia is an improper venue.  The complaint contains no allegations that any of the defendants reside in the District of Columbia, that the property at issue is located in the District of Columbia, or that the allegedly unlawful activities, including the foreclosure action on the plaintiff's property, had any connection to this jurisdiction.  Finally, the Eastern District of Virginia is an appropriate venue for this action.  The question of whether transfer to that district, or dismissal of the action, as urged by the defendants, is appropriate is addressed next.

**B. Transfer rather than dismissal is appropriate**

Under 28 U.S.C. § 1406(a), the district court shall dismiss an action filed in an improper

venue or, if it is in the interest of justice, transfer such case to any district in which it could have

been brought. *See Sharp Elecs. Corp. v. Hayman Cash Register Co.,* 655 F.2d 1228, 1230 (D.C.

Cir. 1981). The decision whether to dismiss or transfer "in the interest of justice" is committed

to the discretion of the district court. *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 789 (D.C.

Cir. 1983). Transfer, rather than dismissal, is in the interests of justice in this particular case for

at least three reasons.

First, the "standard remedy for improper venue is to transfer the case to the proper court

rather than dismissing it—thus preserving a [plaintiff's] ability to obtain review." *Nat'l Wildlife

Fed'n v. Browner*, 237 F.3d 670, 674 (D.C. Cir. 2001) (explaining that the "standard remedy for

improper venue is to transfer the case to the proper court rather than dismissing it—thus

preserving a [plaintiff's] ability to obtain review" (internal citation omitted)); *see also Delta

Sigma Theta Sorority Inc. v. Bivins*, 20 F. Supp. 3d 207, 218 (D.D.C. 2014) ("[T]he interest of

justice generally requires transferring a case to the appropriate judicial district in lieu of

dismissal." (quoting *Johnson v. Deloitte Servs., LLP,* 939 F. Supp. 2d 1, 6 (D.D.C. 2013)

(quoting *Ellis-Smith v. Sec'y of the Army,* 793 F. Supp. 2d 173, 177 (D.D.C. 2011)))). Moreover,

courts have concluded that the presumption in favor of transfer is especially strong where a

plaintiff files a complaint *pro se*. *See Roland v. Branch Banking & Trust Corp.*, 149 F. Supp. 3d

at 68–69 (D.D.C. 2015) (reasoning that it "would be more efficient and economical to transfer

the case to the District of Maryland, rather than . . . [the] a *pro se* plaintiff[] to re-file and re-

serve his Complaint in another District" (citing 14D CHARLES ALAN WRIGHT, ARTHUR R.

MILLER & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3827 (3d ed. 2015)

("District courts are also likely to order transfer rather dismissal than if it would be more

efficient or economical to do so . . . ."))); *King v. Caliber Home Loans, Inc.*, No. CV 15-2061 (RDM), 2016 WL 5415623, at *5 (D.D.C. Sept. 28, 2016) (expressing agreement with *Roland* that "it would be more efficient and economical to transfer [a] case . . . rather than force [the *pro se* plaintiffs] to re-file and re-serve [their] complaint in another District" (quoting *Roland v. Branch Banking & Trust Corp.*, 149 F. Supp. 3d at 68–69)); *Willis v. Green Tree Servicing, LLC*, 156 F. Supp. 3d 121, 123 (D.D.C. 2015) ("A plaintiff who is proceeding *pro se* . . . 'merit[s] additional leniency' in deciding whether a case should be transferred." (internal citations omitted and alteration adopted)); *Bond v. ATSI/Jacksonville Job Corps Ctr.*, 971 F. Supp. 2d 33, 36–37 (D.D.C. 2013) (holding that transfer, rather than dismissal, was especially warranted "when a plaintiff files a complaint *pro se*") (quoting *James v. Verizon Servs. Corp.,* 639 F .Supp. 2d at 15); *Patel v. Phillips*, 933 F. Supp. 2d 153, 166 (D.D.C. 2013) (concluding that dismissal was not "appropriate in the circumstances of this case," in part "because plaintiff is proceeding *pro se*"); *Coltrane v. Lappin*, 885 F. Supp. 2d 228, 235 (D.D.C. 2012) ("[T]ransfer is particularly favored over dismissal when the plaintiff is proceeding *pro se.*"); *McQueen v. Harvey,* 567 F. Supp. 2d 184, 188 (D.D.C. 2008) (noting that transfer was favored because the "plaintiff's status as a *pro se* plaintiff at the time of his filing also merit[ed] additional leniency"); *cf. Haines v. Kerner,* 404 U.S. at 520 (noting that plaintiffs are "[held] to less stringent standards than formal pleadings drafted by lawyers"); *Fletcher v. Reilly,* 433 F.3d 867, 877 (D.C. Cir. 2006); *Childers v. Mineta,* 205 F.R.D. 29, 31 (D.D.C. 2001) (explaining that *pro se* litigants are given more latitude to correct defects in service of process and pleadings).

Second, another consideration is "whether transfer would prejudice Defendant's position on the merits." *McQueen v. Harvey,* 567 F. Supp. 2d at 188 (citing *Sinclair v. Kleindienst*, 711 F.2d 291, 293–94 (D.C. Cir. 1983)); *James v. Verizon Servs. Corp.*, 639 F. Supp. 2d at 15.

Generally, defendants are not significantly prejudiced by transfer.  As the D.C. Circuit has

observed, "[r]efusal to transfer spells the end to the action, while transfer would not prejudice the

defendants' position on [the] merits," and "[t]he Supreme Court has inferred a congressional

purpose underlying section 1406(a) favoring the transfer of cases when procedural obstacles

'impede an expeditious and orderly adjudication . . . on the merits.'"  *Sinclair v. Kleindienst*, 711

F.2d at 293–94 (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–67 (1962)).  Although

both defendants dispute whether the plaintiff has adequately stated a claim, they have not

claimed that they would be prejudiced if the case were transferred to the Eastern District of

Virginia rather than dismissed, which would require the plaintiff to simply re-file the action in

that district.  *See James v. Verizon Servs. Corp.*, 639 F. Supp. 2d at 15.  Indeed, Ditech embraces

the fact that this case should either be dismissed or transferred to the Eastern District of Virginia.

Ditech Mem., at 5 ("The Complaint should be dismissed []or at least transferred to the United

States District Court for the Eastern District of Virginia[] . . . .").

Third, while the D.C. Circuit has recognized that dismissal is often appropriate "when the

outcome is foreordained," *Simpkins v. District of Columbia Gov't,* 108 F.3d 366, 371 (D.C. Cir.

1997), or the complaint has serious "substantive problems," *Buchanan v. Manley,* 145 F.3d 386,

389 n.6 (D.C. Cir. 1998), such obvious substantive defects are not at all apparent in the instant

complaint.  Thus, although courts "decline[] to decide the merits of the plaintiff's claim when it

has already determined that it is an improper venue for adjudicating it," *Roman-Salgado v.

Holder*, 730 F. Supp. 2d 126, 131 (D.D.C. 2010), courts often "take a peek at the merits" when

deciding whether transfer is in the interests of justice, *Laukus v. United States,* 691 F. Supp. 2d

119, 127 (D.D.C. 2010) (citing *Phillips v. Seiter,* 173 F.3d 609, 610–11 (7th Cir. 1999)).  Cases

that have been dismissed rather than transferred include cases where the plaintiff's claims would

be procedurally barred by *res judicata* or the *Rooker-Feldman* doctrine, *McDermott v. BB&T Bank Corp.*, No. 1:16-CV-00532 (APM), 2017 WL 27929, at *1 (D.D.C. Jan. 3, 2017); *Walsh v. Bank of Am. NA*, 113 F. Supp. 3d 108, 114 (D.D.C. 2015) (dismissing plaintiff's claims that would subject to claim preclusion in the other district, but transferring a remaining TILA claim); *McCain v. Bank of Am.*, 13 F. Supp. 3d at 55 (dismissing claims "previously raised by the plaintiff in an earlier suit against the same defendants, premised on the foreclosure of the same property"); *Ananiev v. Wells Fargo Bank, N.A.*, 968 F. Supp. 2d at 132 (finding transfer would be futile because the plaintiff's claims would be subject to claim preclusion), where plaintiffs alleged violations of "their due process rights" but defendants were not state actors and thus plaintiffs' claims would fail if transferred, *Williams v. Wells Fargo Bank N.A.*, 53 F. Supp. 3d 33, 38 (D.D.C. 2014), or where a complaint would "likely have to be dismissed" because it did not "plead administrative exhaustion" as required for the plaintiff's claims, *Roman-Salgado v. Holder*, 730 F. Supp. 2d at 131.  Review of the detailed allegations set out in the plaintiff's complaint, and the defendants' memoranda supporting their motions to dismiss, reveals none of the readily apparent "substantive problems" that would merit dismissal here.[2]  Especially given the strong presumption in favor of transfer, the interests of justice weigh in favor of transferring the case.

Courts may transfer a case to any jurisdiction which would have personal jurisdiction over the defendants and in which venue is proper.  *See* 28 U.S.C. § 1406(a).  Although BANA does not express a view as to transfer, Ditech concedes that the Eastern District of Virginia

---

[2]     Although defendants also argue the plaintiff's claims should be dismissed for failure to state a claim upon which relief may be granted, determining the merits of those motions would require more than merely taking a "peek" at the merits of the plaintiff's claims, *Laukus v. United States*, 691 F. Supp. 2d at 127, particularly when the Court has "already determined that it is an improper venue for adjudicating it," *Roman-Salgado v. Holder*, 730 F. Supp. 2d at 131.  Accordingly, because this Court transfers the case to the U.S. District Court for the Eastern District of Virginia, it does not reach the merits of defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6), or the plaintiff's motion for default judgment against BANA.

would be an appropriate venue for this case, *see* Ditech Mem. at 5 ("The Eastern District of Virginia is the Proper Venue for this Lawsuit"), and as noted above, this jurisdiction would satisfy the venue statute of § 1391(b)(3) as "a substantial part of the events or omissions giving rise to the [the plaintiff's] claim[ ] occurred" in the Eastern District of Virginia, 28 U.S.C. § 1391(b). Thus, since the claim "could have been brought" in the Eastern District of Virginia under 28 U.S.C. §§ 1391(b)(3), the Court finds it is in the interest of justice to transfer this case, pursuant to 28 U.S.C. § 1406(a), to the Eastern District of Virginia.

## IV.    CONCLUSION

For the reasons stated above, the Court TRANSFERS this case to the United States District Court for the Eastern District of Virginia, which is the proper venue to consider plaintiff's claim.

An appropriate Order accompanies this Memorandum Opinion.

Date: February 22, 2017

_____
BERYL A. HOWELL
Chief Judge